THE ELK et al.

(District Court, E. D. Pennsylvania. July 28, 1899.)

COLLISION—LIABILITY OF TUG—FAILURE TO KEEP LOOKOUT.

> A tug, passing down the Delaware river at night with a barge in tow, lashed to her side, and projecting beyond her bow some 40 feet, which failed to keep a lookout on either the tug or tow, must be held in fault, and jointly liable for a collision in which the tow was sunk by another tug, though the collision was caused by the improper navigation of the latter; it not appearing but that it might have been avoided, had there been a proper lookout.

In Admiralty. Libel in rem for collision.

Horace L. Cheyney, for the Elk.
Henry R. Edmunds, for the Carbonero.
Francis C. Adler, for the A. R. Gray.

McPHERSON, District Judge. This action was brought originally by the barge Elk to recover damages from the tug Carbonero for injuries caused by collision. The Carbonero alleged that the injuries were caused, not by her own fault, but by the fault of the tug Gray, and made the Gray a party by petition under the fifty-ninth admiralty rule of the supreme court. The facts are as follows: On the night of December 9, 1895, the Elk was being towed by the Gray down the Delaware river from Richmond to Marcus Hook. The Elk was a hinged barge, about 100 feet long, her two boxes being coupled together, and was loaded with 210 tons of coal under deck, and some stevedore's appliances. She was fastened to the starboard side of the Gray by three lines, the forward box of the barge projecting about 40 or 50 feet beyond the bow of the tug. About midnight the tow was not far below Gloucester, and was approaching the Horseshoe bend, where the river turns towards the west. At this point there is a shoal of considerable extent on the Pennsylvania side of the stream, and a black buoy placed near the western edge of the channel, and somewhat north of the angle made by the bend, serves to mark the turn and to call attention to the shoal. The tug and the barge were of light draught, and both had ample depth of water for at least 200 yards west of the buoy. The tide was about half ebb, and the tug and her tow were in their proper place in the channel, —well over toward the west, and not far from the buoy. Both the side and towing lights of the Gray were properly set and burning, and the captain was at the wheel; but there was no lookout either on the tug or on the barge, and the barge displayed no lights. The Elk was low in the water, and neither her load nor herself obstructed the view of the lights upon the tug. There was no moon, but the night was not dark, and the lights of an approaching vessel could be seen for at least half a mile, and probably much farther. The Carbonero is a large, iron, seagoing tug, and on the night in question was towing three large, empty barges in tandem from Boston to the port of Philadelphia. Each barge was about 200 feet long, and the connecting hawsers increased the length of the tow to about

1,200 feet, or somewhat more than one-fifth of a mile. The proper lights were set and burning on the Carbonero and on each of her barges, and a lookout was on duty upon the tug. As the Carbonero approached the upper angle of the bend from the south, she followed a course that carried her within 50 feet of the black buoy, or thereabouts, and not far from this point the collision occurred. The Carbonero and the forward box of the Elk came together. The port side of the box was crushed in and sank west of the buoy almost at once, while the Carbonero suffered no damage, and proceeded upon her voyage without stopping to inquire what injury had been done.

As might be expected, there are two diametrically conflicting accounts of the transaction; each tug accusing the other of attempting to cross her bow, and the crew of each supporting the accusation with substantial unanimity. Without discussing the testimony in detail, I think it is enough to say that the account given by the Gray seems to me to be substantially correct. There are three reasons that justify this conclusion: First; The Carbonero was admittedly on the wrong side of the river. The channel was at least a half mile wide at the point of collision, and she ought to have been several hundred feet nearer the Jersey shore, instead of upon the Pennsylvania edge of the channel. I have no doubt that she was cutting the angle close, in order to save time and distance, and that when she saw the approaching lights of the Gray she endeavored to force her to the eastward, because she herself was then so far west that she probably feared a collision between one of her barges and the Gray if she obeyed the Gray's signal and swung round toward her proper place on the Jersey side. Second; The Carbonero's assertion that the green light of the Gray was first seen, and that the Gray was then "well to the eastward," is incredible. If this assertion had been true, neither tow would have been in danger; and it is highly improbable that the Gray would have deliberately left a place of safety, and run the risk of collision, when nothing could have been gained by such change of course. Third; it is also incredible that, when the Carbonero and the Elk came together, the Elk had been cast off by the Gray and was drifting downstream, and that the Carbonero had checked her headway and was nearly at rest. Under such circumstances, if the stem of the Elk had struck the Carbonero a right-angle blow abaft the bow, as the master of the Carbonero alleges, with a force sufficient to crush herself, it is hardly possible that the Carbonero would have escaped, as she did escape, with no damage at all. Her witnesses go too far. One witness says that she had "a mark in the morning about ten feet abaft the stem," without further description of the "mark"; others declare that the barge did her no damage, and that the blow was hardly felt; while another provides for any contingency by swearing that the blow was not only "gentle," but was also "hard." In my opinion, the stem of the Carbonero struck the Elk on her port side, near the bow, while both craft were under way, thus doing the damage complained of. I cannot rely on the Carbonero's testimony concerning the signals. It is discredited by reason of her inaccurate testi-

mony in other respects, and also because of its improbability, in case the position of the Gray were really over toward the Jersey shore. I find that the proper signal for passing port to port was given by the Gray, and was at first accepted by the Carbonero; the fault of the contradictory signal that was afterwards made resting wholly upon the latter.

The liability of the Carbonero is determined by the facts already found, without calling in the aid of the act of 1890 (1 Supp. Rev. St. 800), which declares the duty of vessels to stay by in case of collision, and establishes a presumption of fault upon the part of a vessel that neglects such duty. Accordingly, I have not considered the applicability of this statute in the present case.

With regard to the liability of the Gray, I see one point only upon which it can be rested, but of this there can be no doubt. She had no lookout, either upon the barge or upon her own deck, and, under the authorities, such omission ordinarily is blamable negligence. I have been referred to no statute or rule that required the Elk to carry lights, lashed as she was to the Gray, but a lookout should have been stationed either upon the tug or upon the barge. Under the facts in proof, it is impossible to say whether the collision would or would not have been avoided if this had been done. The inquiry would be speculative, and therefore profitless. For present purposes it is enough to say that the Gray failed in a plain duty, and that an injury has occurred which might have been prevented if the duty had been performed. The Gray therefore must also be held liable for the collision.

A commissioner (to be agreed upon by the parties, if possible) will be appointed to determine the amount of the damage, and to apportion such amount between the two tugs; report to be made on or before October 1st.